UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JUAN MARTINEZ,<br><br>     Plaintiff,<br><br>     v.<br><br>DEBBIE FIELD, DAVID MCLUSKEY,<br>CINDY WILSON, KEITH YORDY,<br>D.W. PENEKU, D.W. COBURN, SGT.<br>BILOA, SGT. BILADEAN, CPL.<br>DAVIDSON, and C/O ADAIR,<br><br>     Defendants. | Case No. 1:17-cv-00337-DCN<br><br>**MEMORANDUM DECISION AND**<br>**ORDER** |

## I. INTRODUCTION

Pending before the Court are Defendant Garrett Coburn's Motion to Dismiss (Dkt. 28) and Motion for Summary Judgment (Dkt. 27). Also pending are Plaintiff Juan Martinez's two motions to strike (Dkts. 35, 43) documents Coburn filed in support of his two motions.

Having reviewed the record and briefs, the Court finds that the facts and legal arguments are adequately presented. Accordingly, in the interest of avoiding further delay, and because the Court finds that the decisional process would not be significantly aided by oral argument, the Court will decide the Motions without oral argument. Dist. Idaho Loc.

MEMORANDUM DECISION AND ORDER - 1

Civ. R. 7.1(d)(1)(B). For the reasons set forth below, the Court finds good cause to DENY Coburn's Motion to Dismiss, GRANT Coburn's Motion for Summary Judgment, and DENY Martinez's Motions to Strike.

## II. BACKGROUND[1]

Martinez is an inmate in the custody of the Idaho Department of Correction (IDOC) who resides at the Idaho State Correctional Institution (ISCI).

When Martinez entered prison "approximately six years before" the events giving rise to his claims, he notified prison officials that he had withdrawn from all gang activity and "had a 'green light' placed on him by prison gangs," meaning that gang members had instructions to "assault [sic], injure or possibly kill Plaintiff" in prison. Dkt. 12, at 8. Martinez alleges that at that time, prison officials "did or should have placed a 'red flag' in all of Plaintiff's prison files," to alert other officials of the "pervasive risk and danger against the Plaintiff by prison gangs." *Id.*

In May of 2016, Martinez was transferred to Unit 15, which "[f]or a number of months[,] . . . was used to house gang members including rival gang members." *Id*. at 5. Martinez states that it was "common knowledge" that Unit 15 was "a violent housing unit," because "there were numerous violent incidents" in that unit. *Id.* Either before or shortly after Martinez was moved to Unit 15, he claims that he sent a concern form to Defendant Coburn. The concern form allegedly notified Coburn that Martinez believed he was in danger from inmate gang members in Unit 15 because he had dropped out of all gang

---

[1] The facts are taken from Martinez's Amended Complaint (Dkt. 12) and construed in the light most favorable to him as the nonmoving party. *See Scott v. Harris*, 550 U.S. 372, 380 (2007).

activity. *Id*. at 6. Coburn did not respond to Martinez's concern form. Coburn, along with Defendants Peneku and Yordy, purportedly approved Martinez's transfer to Unit 15. *Id*. at 7.

On June 10, 2016, Martinez had a dialysis appointment, after which he returned to his locked cell and fell asleep. *Id*. at 8. While he was sleeping, unidentified inmate gang member/s somehow got into Martinez's cell and "brutally attacked" him, rendering him unconscious and causing serious injuries. *Id*. at 9.

Although IDOC policy requires two floor officers per unit, Defendant Adair was the only officer assigned to the unit floor on the day of the attack. *Id.* However, Defendant Adair had left his post prior to the attack, leaving the unit floor without an officer during the period of time Martinez was attacked. When Plaintiff regained consciousness, he pressed the "emergency call light" on the wall of his cell, but no one immediately responded. *Id*. The call light would have alerted the control center officer and pursuant to IDOC policy, the control officer would have notified the floor officer—here, Defendant Adair—who, in turn, "is supposed to drop whatever he or she is doing and go immediately to the cell . . . to find out what is wrong." *Id*. at 9-10. Defendant Adair later found Martinez and called for medical attention. Martinez was taken to the hospital and treated for his injuries. *Id*. at 10-11.

On August 8, 2017, Martinez filed suit against Adair, Coburn, and several other prison officials, including the warden of the prison and the members of the Idaho State Board of Correction. Martinez asserted claims under the Eighth and Fourteenth

Amendments, as well as Idaho Code § 18-313. *Id*. at 15.

On February 14, 2018, the Court issued an initial review order. Dkt. 10. In that decision, the Court found that Martinez's claims were too vague and that he would need to file an amended complaint in order to proceed. *Id*. Martinez complied (Dkt. 12) and the Court undertook a successive review (Dkt. 14). Ultimately, the Court determined that Martinez could proceed with a single Eighth Amendment failure-to-protect claim against Coburn. Dkt. 14, at 7-8. Specifically, the Court concluded that:

> [A] factfinder could plausibly infer, from the allegations in the Amended Complaint, that Defendant Coburn was subjectively aware that Plaintiff faced a substantial risk of serious harm in Unit 15 yet deliberately disregarded that risk. Plaintiff's concern form, which was addressed to Coburn, would have notified Coburn that Plaintiff had withdrawn from all gang activity and, as a result, was in danger from the inmates housed in Unit 15.

*Id.* at 7.

On March 14, 2019, Coburn filed a motion to dismiss contending that Martinez had failed to exhaust the administrative remedies available to him. Dkt. 28. Less than two weeks later, Coburn filed a motion for summary judgment arguing there are no material facts in dispute in this case and that he is entitled to qualified immunity. Dkt. 31.

Martinez subsequently filed two motions to strike. One is associated with a declaration filed by David Gould in support of Coburn's Motion to Dismiss. Dkt. 35. Martinez's second motion seeks to strike the supplemental declaration of Nicholas Blackburn filed in conjunction with Coburn's Motion for Summary Judgment. Dkt. 43.

## III. ANALYSIS

### A. Coburn's Motion to Dismiss (Dkt. 28)

#### 1. Introduction

In his Motion to Dismiss, Coburn asserts that Martinez failed to exhaust his administrative remedies under the Prison Litigation Reform Act (PLRA) with respect to his failure-to-protect claim and that, as a result, the Court must dismiss this claim. In short, Coburn suggests that Martinez failed to file concern or grievance forms with ISCI, as required, before filing suit. Martinez vehemently opposes this notion, asserting that he did in fact file the requisite forms, but that even if he had not, it was not his fault as those forms were not available to him. The Court will address the arguments in turn.

#### 2. Legal Standard

Title 42 U.S.C. § 1997e(a) provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." As the United States Supreme Court has held, "There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." *Jones v. Bock,* 549 U.S. 199, 211 (2007).

If a plaintiff has failed to exhaust his administrative remedies, his claim is subject to dismissal without prejudice upon motion of the defendant. *See, Wyatt v. Terhune,* 315 F.3d 1108 (9th Cir. 2003). An inmate must exhaust his remedies *prior* to filing suit; exhaustion cannot be accomplished during a suit or after a suit has been filed. *See*

*McKinney v. Carey,* 311 F.3d 1198 (2002) (suit dismissed without prejudice where prisoner attempted to exhaust administrative remedies during pendency of suit).

"Proper" exhaustion of administrative remedies is required, meaning that "a prisoner must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a precondition to bringing suit in federal court." *Woodford v. Ngo,* 548 U.S. 81, 88 (2006).

In *Wyatt v. Terhune,* the Ninth Circuit determined that the proper procedural device for alleging failure to exhaust administrative remedies is "an unenumerated Rule 12(b) motion." 315 F.3d at 1119. To resolve such a motion, "the court may look beyond the pleadings and decide disputed issues of fact." *Id.* at 1119-20. In such instances, the court "has broad discretion as to the method to be used in resolving the factual dispute." *Ritza v. Int'l Longshoremen's and Warehousemen's Union,* 837 F.2d 365, 369 (9th Cir. 1988). However, the court "must assure that [the petitioner] has [had] fair notice of his opportunity to develop the record." *Wyatt,* 315 F.3d at 1120 n. 14.

3. *Discussion*

The underlying facts regarding whether Martinez complied with the PLRA are muddy at best. Before outlining the parties' positions, however, it is important to understand the overall grievance process.

ISCI follows IDOC's grievance process. In short, the process has three levels. First, any inmate with a concern must seek an informal resolution by filling out an offender concern form addressed to the staff person "most capable of responding to and, if

appropriate, resolving the issue." Dkt. 28-2, at ¶ 18. If the issue cannot be resolved informally with a concern form, the inmate must then file a grievance form. *Id.* A grievance must be filed within 30 days of the incident or problem that is the basis for the grievance. *Id.*

If a staff member does not respond to the inmate concern form within seven (7) days, the offender can elect to submit another concern form to another staff member or skip to the grievance process. *Id.* If an offender decides to skip to the grievance process, he must write "no response" in the staff section of his copy of the form and attach it to the grievance form. *Id.*

When submitting a grievance form, the inmate must attach a copy of the offender concern form, showing the inmate's attempt to settle the issue informally. *Id.* at ¶ 19. Aside from including information regarding the nature of the complaint, the grievance form must contain specific information including dates, places, and names. *Id.* Only one issue may be raised in each grievance, and the offender must suggest a solution to the issue. *Id.* All grievances are logged into an electronic database used to track grievances. *Id.* at ¶ 11

Upon receipt of a correctly filed grievance, the grievance coordinator assigns the grievance to the staff member most capable of responding to and, if appropriate, resolving the issue. *Id.* at ¶ 21. That staff member then answers and returns the grievance to the grievance coordinator. *Id.* The grievance coordinator then forwards the grievance and staff response to a reviewing authority, who reviews the grievance and staff response as well as, if necessary, any applicable rules, policies, procedures, etc., and either denies, modifies, or

grants the solution suggested by the inmate. *Id.* The grievance coordinator then files a copy of the original grievance form and returns the original grievance form to the inmate, together with a copy of the responses of the assigned staff member and reviewing authority. *Id.* If the decision on an inmate's grievance is not satisfactory to the inmate, the inmate may appeal that decision. *Id.* at ¶ 22. When the grievance coordinator receives an appeal, they log it and forward it to the appellant authority. *Id.*

Upon completion of all three steps, i.e., the Offender Concern Form, Grievance Form, and Appeal Form, the grievance process would be considered exhausted. *Id.* at ¶ 23.

As part of his Amended Complaint, Martinez explains that after he was moved to Unit 15, he "sent Defendant Coburn a Concern placing Coburn and all other ISCI officials on notice of being at pervasive risk of being assaulted or killed because of dropping out of all gang activity and gangs." Dkt. 12, at ¶ 27 (internal quotation marks omitted). Martinez then cites to "Exhibit 1" in support of this statement. Exhibit 1 (Dkt. 12, at 21) is a concern form, however, it is not legible. With the exception of Martinez's name at the top of the form, it is virtually impossible to decipher anything else on the document: the date, the details, the signatures, etc.

Coburn apparently asked for any identifying information that might help determine the details on this specific form during discovery, but Martinez did not provide any.[2]

---

[2] Martinez claims that ISCI does not provide carbon copies of the concern forms and, therefore, it is not his fault—but rather Defendants—that there are no details about this specific form. First, Martinez could have tried to provide some details (even from memory) about this form in order for the Court to determine if it actually contained the information he claims it contained. Furthermore, as will be explained in greater detail below, Coburn has reviewed copies of all concern and grievance forms during the relevant timeframe, as well as all forms ISCI has record of from Martinez, and cannot identify any that relate to gang affiliation in

MEMORANDUM DECISION AND ORDER - 8

Simply put, the Court has no way of knowing whether this form (Dkt. 12, at 21) relates to the issue at hand or not. In his briefing, Martinez confusingly references other concern forms and notes that the illegible form was actually his second effort to exhaust the administrative process; however, there is still nothing in the record related to his gang concerns within Unit 15. Dkt. 34, at 1-2.

Martinez also explains that the concern form he filed against Adair (regarding the fact that he was not at his post when the assault happened) should count as his "open[ing] the door" to this overall issue and should satisfy IDOC's administrate grievance process requirements. Dkt. 34, at 2. Martinez's hope to "open the door" on the assault notwithstanding, his concern form against Adair is specific to Adair and his behavior, not Coburn. *See* Dkt. 12, at 25. Accordingly, the Adair concern form cannot serve as the basis for this suit *against Coburn*.

Furthermore, there is some confusion regarding when Martinez purportedly filed any grievance form. Martinez claims that he was transferred to Unit 15 "on or about the last day of May 2016." Dkt. 12, at ¶ 17. Since the assault occurred on June 10, 2016, Martinez seems to be suggesting that he would have had limited time to go through the administrative process before being attacked. IDOC records, however, indicate that Martinez was transferred from the medical infirmary to Unit 15 on April 28, 2016. Dkt. 28-7, at 60. This is important because if, as Martinez suggests, he was so fearful of being transferred, he would have filed any grievance form right away. With the correct timeline

---

Unit 15 or to Martinez's fear of being moved to Unit 15. In short, there is no indication that Martinez even filed the first form, a concern form, as required.

in place, it is clear Martinez was housed in Unit 15 for 43 days (as opposed to roughly 10 as he represents) before being assaulted. There would have been adequate time to file a concern form and remedy the transfer had it been important to Martinez. Martinez claims the illegible concern form was filed "after" he was transferred but before the assault, but again, ISCI has no record Martinez filed such form. In short, the Court cannot find anything in the record to support the assertion that Martinez filed a concern form *before* the assault (regardless of whether it was before or after Martinez was transferred to Unit 15). While this is mostly relevant when discussing summary judgment, it is also noteworthy here.[3]

Separately, Martinez argues that he did not have the ability to file a concern form *after* the attack for two primary reasons: 1) he could not procure concern forms in the infirmary, and 2) he was "in a comatose state." Dkt. 34, at 3. For either (or both) of these reasons, Martinez asserts he should not be required to comply with the PLRA's exhaustion requirement.

Martinez first alleges that he was unable to secure the correct forms while in the infirmary (when he was recovering from the attack) because such forms have never been available there. Coburn rejects this argument, explaining that not only are forms available in the infirmary, but even if they were not, a prisoner could still get a concern form by simply asking for one at the officer station. In support of this explanation, Coburn

---

[3] Martinez also states that Coburn never responded to his concern form. First, if there was no concern form, Coburn could not have responded. Second, however, even if Martinez had filed a concern form and it was unanswered, IDOC procedures allow for the aggrieved party to either submit another concern form or skip to the grievance process. Dkt. 28-2, at ¶ 18. In other words, even assuming Coburn did not respond to his concern form, such would not have precluded Martinez from filing a grievance form.

submitted the declaration of David Gould. Dkt. 28-5. Gould is the current Medical Unit Sergeant at ISCI. *Id.*

Martinez responded to Gould's declaration with his first motion to strike asserting that Gould is not qualified to make such a claim (that grievance forms were available in the infirmary in 2016) because Gould did not become acting sergeant of the medical unit until November 2018. In support, Martinez filed a declaration from a fellow inmate, Christopher Weaver, who explains that he has been housed in the medical infirmary for many years and that there were no concern or grievance forms available to inmates in 2016. Weaver further states that "grievance boxes" were not available until 2019, when Gould installed them. In light of these facts, Martinez asks that the Court strike Gould's affidavit since he has no personal knowledge of whether concern forms were available in 2016.

In response, Coburn claims that Gould's declaration was not submitted to explain the circumstance of the infirmary in 2016, but to rebuff Martinez's assertion in his Amended Complaint that "the ISCI infirmary *did not nor has it ever* provided and made available Concerns and Grievances to inmates while housed in the infirmary thus making all IDOC grievance remedies 'unavailable' to inmate patients including the Plaintiff." Dkt. 12, ¶ 75 (emphasis added). Said differently, according to Gould, he is not testifying about circumstances in 2016, but just disputing Martinez's claim that the ISCI infirmary has *never* provided grievance forms. This explanation is a bit nuanced. If, by his own admission, Gould is simply rebuffing a singular claim in Martinez's Amended Complaint about the general availability of forms in the medical unit, such is appreciated, but it does

little to explain what the circumstances were in 2016—the relevant time period.

This concern aside, Gould has stated elsewhere that while he was not the Medical Unit Sergeant in 2016, he was nonetheless employed at ISCI and during his years of employment there (including 2016) and he has never seen a situation in which an inmate—even one housed in restrictive housing—was not able to obtain the necessary concern or grievance forms. Dkt. 38-3, at 2. Furthermore, IDOC's standard operating procedures outline that "all offenders can use the grievance process regardless of their classification or housing status." Dkt. 28-7, at 9. Coburn also provided the Court with a 2014 concern form from an inmate housed in the infirmary. Dkt. 29-1, at 2.[4]

In short, the Court DENIES Martinez's Motion to Strike. The Court will not strike Gould's testimony because it is what it is: an assertion that Martinez is wrong in saying that the ISCI infirmary has *never* had forms available for inmates. The Court will give Gould's testimony the weight it deems appropriate. However, the Court will not read into Gould's testimony any unnecessary inferences concerning the availability of forms in 2016 in the infirmary.

Once all is said and done, the Court does not affirmatively know whether the concern and grievance process was available to inmates housed in the infirmary in 2016. There is persuasive evidence and testimony that suggests such was the case, but a declaration from the 2016 Medical Unit Sergeant (for example) would have solidified this issue.

---

[4] Even then, however, all of this evidence does not *conclusively* settle the question of whether Martinez had access to concern and grievance forms in 2016 while in the infirmary.

Martinez's second argument is that he was "comatose" and could not file the necessary forms after the incident. Joni Lemons, ISCI's Registered Nurse Manager,  has provided the Court with a copy of one of Martinez's medical records dated June 21, 2016, which lists Martinez's condition on discharge as "stable." Dkt. 38-2, at 2. Lemons also provided a second medical record dated June 21, 2016, which provides that Martinez was "admitted to infirmary until stabilized. Then moved to LTC. B/c of closed custody status, he may need to physically remain in infirmary." *Id.* at 4. Thus, if Martinez was ever "comatose," his medical records make clear that but for his close-custody status, he would have been released from the infirmary by June 21, 2016; well within the 30-day window for filing a grievance related to the June 10, 2017, assault.

In summary, it does not appear from the record that Martinez exhausted his administrative remedies. There is no legible or legitimate concern form about the incident that implicates Coburn and/or Martinez's fear of being housed in Unit 15. That said, because there is confusion surrounding the concern form (i.e. whether one even exists), whether any of the forms Martinez filed satisfy the PLRA exhaustion requirement (such as the Adair concern form), and/or whether Martinez was able to access such forms while in the infirmary in 2016, the Court will liberally construe these facts in Martinez's favor and assume arguendo that he did exhaust his remedies or did not have the opportunity to do so.

The Court does not do this lightly. As noted previously, it appears that Coburn, ISCI, and IDOC undertook an extensive search of their records to substantiate Martinez's claims. After a comprehensive review, no related concern or grievance forms surfaced. In addition,

even though Coburn has not concretely settled the question of whether concern forms were available in 2016 in the infirmary, there is enough peripheral evidence to support such an assertion.

That said, the Court wishes to address the substantive nature of Martinez's claims because, while the administrative process discussion may leave some lingering questions, the Court's conclusion regarding summary judgment takes into account any of those discrepancies and *still* finds that Coburn is entitled to summary judgment.

### B.  Coburn's Motion for Summary Judgment (Dkt. 31)

#### 1.  *Introduction*

In his Motion for Summary Judgment, Coburn argues that he never received any concern form from Martinez and was not involved in the decision to move him to Unit 15. Coburn also argues that, even assuming he had been involved in the circumstances at bar, he is entitled to qualified immunity. The Court will address each argument in turn.

#### 2.  *Legal Standard*

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court's role at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Zetwick v. Cty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) (citation omitted). Importantly, the Court does not make credibility determinations at this stage of the litigation. Such determinations are reserved for the trier of fact. *Hanon v. Dataproducts Corp.*, 976 F.2d

497, 507 (9th Cir. 1992).

In considering a motion for summary judgment, the Court must "view[] the facts in the non-moving party's favor." *Zetwick*, 850 F.3d at 441. To defeat a motion for summary judgment, the respondent need only present evidence upon which "a reasonable juror drawing all inferences in favor of the respondent could return a verdict in [his or her] favor." *Id.* (citation omitted). Accordingly, the Court must enter summary judgment if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The respondent cannot simply rely on an unsworn affidavit or the pleadings to defeat a motion for summary judgment; rather the respondent must set forth the "specific facts," supported by evidence, with "reasonable particularity" that precludes summary judgment. *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001).

*3. Discussion*

The Eighth Amendment protects prisoners against cruel and unusual punishment. Under this standard, inmates have a right to be incarcerated in a reasonably safe environment. "Prison officials have a duty to take reasonable steps to protect inmates from physical abuse." *Hoptowit v. Ray*, 682 F.2d 1237 (9th Cir. 1982), *overruled on other grounds by Sandin v. Conner*, 515 U.S. 472 (1995). This right includes being protected from constant threats of assault from other inmates. *Ramos v. Lamm*, 639 F.2d 559, 572 (10th Cir. 1980), *cert. denied*, 450 U.S. 1041 (1981). An inmate does not need to wait until

MEMORANDUM DECISION AND ORDER - 15

he is actually assaulted to obtain relief. *Id.*

To prevail on an Eighth Amendment failure-to-protect claim, an inmate must satisfy a two-pronged test. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). First, "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Id.* The risk alleged must be "objectively, sufficiently serious." *Id.* (citations and punctuation omitted).

Second, the prison officials must have acted with deliberate indifference to prisoner health or safety. *Id.* "Deliberate indifference" is a higher standard than negligence and requires that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. A prison official may know of a substantial risk "from the very fact that the risk was obvious." *Id.* at 840.

However, prison officials are not liable if 'they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent.'" *Id.* at 844. "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* "A prison official's duty under the Eighth Amendment is to ensure 'reasonable safety,' not absolute safety." *Savocchio v. Crabtree*, No. CV-97-1698-ST, 1999 WL 562692, at *5 (D. Or. July 12, 1999) (quoting *Farmer*, 511 U.S. at 844).

i.      First Prong of the Farmer Test

The Court first considers whether housing Martinez in Unit 15 presented an objective, substantial risk of serious harm. Importantly, general fears about being harmed by a fellow inmate or a prison gang are not enough to satisfy this requirement. As one district court explained:

> Inmates have no claim under the Eighth Amendment based on a general unsubstantiated fear of assault by a fellow inmate or by a specific group. Otherwise, courts would be flooded with prisoner litigation. Instead, to satisfy *Farmer*, the prisoner must present evidence of a particularized fear based upon prior threats or upon members of a specific group who have the motive and the ability to commit an assault themselves or through intermediaries.

*Savocchio*, 1999 WL 562692, at *9.

Here, Martinez has not been able to point to any past violence he suffered in Unit 15 or any violence between himself and any specific individual housed in Unit 15.[5] The Court does not wish to minimize the attack, or any related fears or concerns Martinez may have had. However, the relevant inquiry is not whether Martinez's concerns were valid and/or understandable, but whether housing him in Unit 15 presented an objective, substantial risk of serious harm.

Martinez attempts to satisfy the objective element of the deliberate indifference test by alleging it was common knowledge among prison officials that Unit 15 was a violent housing unit, and specifically that Coburn was aware of these conditions because he received an incident report each time an assault occurred. Dkt. 12, ¶¶ 20—22.

---

[5] It is true that Martinez had violent interactions in the past with other inmates while incarcerated, however, the attack in question did not involve any of those individuals.

MEMORANDUM DECISION AND ORDER - 17

As to the first assertion, Coburn represents that of the 309 Disciplinary Offense Report's (DOR's) filed in the year leading up to the attack on Martinez, 167 involved inmate-on-inmate violence. Dkt. 31-2, at 6; 31-5, at 11-15. Of those, only 6 were gang related, and only one of those (gang related incidents) occurred in Unit 15. *Id.* In short, it is not readily apparent that housing Martinez (or any individual for that matter) in Unit 15 exposed him to a higher risk of being assaulted by gang members.

As to the second assertion, Coburn admits that he is sometimes involved in the review of DOR's, and/or becomes aware of specific instances of inmate-on-inmate violence, but that as a general policy, he does not receive or review copies of every incident report. Dkt. 31-3, at 4.

In sum, the Court finds no evidence to support a finding that housing Martinez in Unit 15 presented an objective, substantial risk of serious harm. As such, Martinez cannot succeed on his Eighth Amendment claim, and summary judgment is appropriate.

ii.    *Second Prong of the Farmer Test*

Even if the Court assumes that the first prong of the *Farmer* test is satisfied, summary judgment is still appropriate because Coburn did not act with deliberate indifference towards Martinez's individual circumstances.

As a threshold matter, Coburn notes that he does not oversee the housing of inmates. As Deputy Warden of Operations at ISCI, Coburn was in charge of programming, operations of the reception and diagnostics, food services, education, and volunteer services, but *not* inmate placement or housing. Dkt. 31-3, at 1. Coburn explains that

housing arrangements and inmate moves were typically arranged by the Move Coordinator, a position that is security-related and not within in Coburn's purview. *Id.* at 3. Coburn rarely, if ever, became involved in inmate moves. *Id.*

Specific to this case, Coburn states that he was not aware of Martinez's move to Unit 15, made no decisions regarding the move, and does not know why Martinez was moved to Unit 15. *Id.* at 3-4. In fact, Coburn has declared that he cannot recall having ever even met Martinez, has no recollection of reviewing his file, and has no personal knowledge that Martinez was affiliated with any gang. Dkt. 31-3, at 3. Coburn asserts that his lack of personal participation in the decision to move Martinez entitles him to summary judgment.

Martinez does not respond to this argument outright, but asserts that "Coburn was appraised of the violence in Unit 15" and knew "or should have been alerted" to the fact that Martinez was a former gang member and could face harm if housed there. Dkt. 39, at 10. As was already explained in relation to violence in Unit 15, and as will be explained in relation to Martinez's gang affiliation, it does not appear these statements accurately reflect Coburn's state of mind. Even if they did, however, Coburn's lack of participation in moving and/or housing Martinez is all but fatal to his claim. *See Taylor v. List,* 880 F.2d 1040, 1045 (9th Cir. 1989) ("Liability under Section 1983 arises only upon a showing of personal participation by the defendant.").

The Court returns to the elements of the *Farmer* test. To establish deliberate indifference, Martinez must show that the Coburn was: (a) subjectively aware of the

substantial risk of serious harm; and (b) failed to adequately respond. *Farmer*, 511 U.S. at 828. Here, no reasonable juror could find Coburn's actions subjectively indifferent to Martinez.

Martinez alleges that he told prison officials that he had dropped out of all gang activity and further, that he alerted them to the fact that his dropping out could make him a target for retaliation, including violence.

In response, Coburn submitted the declaration of Nicholas Blackburn, who explained the process an inmate goes through when he or she enters the prison system and how their responses to certain questions help prison officials determine specific security functions—such as where the inmate will be housed. Dkt. 31-6. Blackburn reviewed Martinez's file and noted that when Martinez entered the prison system, he was asked to fill out a Security Threat Group ("STG") Questionnaire. This form included information regarding suspected or actual gang membership. Martinez has been in and out of prison since approximately 1996. The entries related to Martinez include an entry dated June 11, 2007, identifying him as a suspected member of the Norteno security threat group. Dkt. 31-6, at 2. His suspected membership in the gang was based upon specific "tattoos." *Id.*

On or about January 9, 2012, when Martinez reentered the prison system, he was asked to fill out a STG Questionnaire again. In that particular questionnaire, Martinez was asked: "Have you ever been a member of, or associated with members of a gang or extremist group?" and "Are any of them [your tattoos] gang related?" *Id.* Martinez responded "no" to both questions. *Id.* His Case Manager Notes from the same date state:

"Offender completed an STG Questionnaire but did not report any gang affiliation. He is already documented as being a Norteno." *Id.*

On June 25, 2016—after the attack—Martinez's STG Detail page was updated to reflect Martinez as a suspected Sureno. *Id.* The method section of the form indicates this was "self-reported," and the comment section was updated to reflect Martinez's assertion that he "is no longer active." *Id.* at 3.

As part of his declaration, Blackburn also stated that "prior to the June 10, 2016 assault, the [] system did not contain any restrictions or "red-flags" alerting staff Martinez should not have been housed with a specific inmate or on a particular tier." *Id.* at 4.

The Court must now digress and discuss Martinez's second motion to strike.

On April 16, 2019—as part of his response to Coburn's motion to summary judgment—Martinez filed his own declaration and noted that his file did in fact contain entries alerting officials to the fact that he had had problems with two individuals and should not be housed with them. *See* Dkt. 40, at 4. Succinctly put, Martinez's testimony directly contradicts Blackburn's testimony.

As part of his reply to his motion for summary judgment, Coburn included a supplemental declaration of Blackburn. Dkt. 39-2. In his supplemental declaration, Blackburn explains that his previous comment was in error and that there were in fact notes in Martinez's file about inmates that he should not be housed with. Blackburn explained those details (which will be discussed below) and apologized to the Court for the oversight. *Id.*

MEMORANDUM DECISION AND ORDER - 21

In response, however, Martinez filed a Motion to Strike Blackburn's supplemental affidavit. Dkt. 43. In his motion, Martinez asserts that Coburn is trying to do "damage control" after being caught misleading the court and that the information Blackburn provides is not credible. *Id.*

In response, Coburn (or more accurately Blackburn and Coburn's counsel) admits full responsibility for the erroneous statement and explains that he (Blackburn) does have personal knowledge of the matters he is testifying to as he is an ISCI investigator and reviewed Martinez's file before making his statements. Under Federal Rule of Civil Procedure 56, Coburn asserts Blackburn's testimony is admissible.

Upon review, the Court will DENY Martinez's Motion to Strike. To begin, Blackburn's supplemental affidavit *helps* Martinez. It shows that there were in fact prior "flags" or notations of violence in his file that might have warranted safety precautions. Now, as will be explained below, the incidents in the file were unrelated to the 2016 attack and therefore, do not support the proposition that Coburn knew Martinez was in danger, but nonetheless, the information is helpful. Second, while it is true that Blackburn and Coburn's counsel should have been more thorough in their review of the record and Blackburn's affidavit, the mistakes do not appear nefarious. Sloppy, maybe; deceitful, no.

In short, the Court will give Blackburn's supplemental affidavit the weight it deems appropriate. The Court returns to the subjective prong of the *Farmer* test and whether Coburn was deliberately indifferent to Martinez's safety.

With Blackburn's affidavit corrected, it appears clear that Martinez had certain

notations in his file. Those notations, however, were related to a separate incident years earlier involving two individuals by the names of Arce and Gonzalez-Suarez. Dkt. 42-3, at 2. The notes in Martinez's file outline that he should not be housed with either of these inmates due to "threats of physical harm." *Id.*

As applied to this case, however, it is important to note that these restrictions were related to *individuals* Martinez should not be housed with, not any particular housing Unit. Most important, however, is the fact that the form indicates the prior incident *was not* STG (Security Threat Group, i.e. "gang") related. *Id.* Additionally, the individual who assaulted Martinez on June 10, 2016, was neither of the individuals listed as inmates Martinez should not be housed with. Thus, even though this prior incident was included in his report, it in no way would have alerted Coburn to the fact that Martinez would be attacked in Unit 15 by a completely different individual.[6]

In short, there is no evidence in the record to suggest Coburn was subjectively aware Martinez faced a substantial risk of being assaulted in Unit 15. By all accounts, Coburn did not even know Martinez, let alone participate in the decision to house him in Unit 15. Furthermore, even if the Court were to assume that Coburn knew Martinez, was familiar with his file, and/or had seen the notes regarding gang affiliation or prior violence, the outcome does not change. There is still no evidence the June 10, 2016, assault could have been averted had Coburn reviewed Martinez's file because there was nothing therein concerning Unit 15 and the assault on Martinez was neither gang-related nor did it involve

---

[6] The incident report for the June 10, 2016, assault also indicates the event was not STG related. Dkt. 42-3, at 4. Thus, Martinez's entire argument that the assault was tied to gang affiliation is suspect.

the individuals who previously assaulted Martinez. In short, there is no evidence Coburn was indifferent towards Martinez's rights when Martinez was transferred to Unit 15, or that Coburn specifically intended the transfer to result in the "wanton infliction of unnecessary pain." S*ee Estelle v. Gamble*, 429 U.S. 97, 105 (1976).

The Supreme Court has made clear: "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial," and summary judgment is appropriate. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

Here, the record taken as a whole could not lead a rational trier of fact to find that Coburn objectively knew Unit 15 was a dangerous housing unit, or that he subjectively knew that placing Martinez there would result in harm. As such, summary judgment is appropriate.[7]

///

///

///

///

///

///

---

[7] Coburn also asserts he is entitled to qualified immunity. Qualified immunity generally shields "governmental officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate 'clearly established' statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). Ultimately, if the law is clear, and the individual's behavior was legal, immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341 (1986). It is clear from the record in this case that Coburn's conduct was lawful and did not violate Martinez's rights. Accordingly, Coburn is entitled to qualified immunity. This is an additional, independent reason summary judgment should be granted in Coburn's favor.

## IV. ORDER

1. Coburn's Motion to Dismiss (Dkt. 28) is DENIED.

2. Coburn's Motion for Summary Judgment (Dkt. 31) is GRANTED.

3. Martinez's Motions to Strike (Dkts. 35, 43) are DENIED.

4. The Court will enter a separate Judgment in accordance with Fed. R. Civ. P. 58.

DATED: May 21, 2020

David C. Nye
Chief U.S. District Court Judge

MEMORANDUM DECISION AND ORDER - 25